IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:07-cv-00320-GCM

| | |
|---|---|
| **MECKLENBURG COUNTY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| **NORTEL GOVERNMENT SOLUTIONS** ) | |
| **INCORPORATED f/k/a PEC SOLUTIONS,** ) | |
| **INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** comes before the Court on Defendant's Motion to Dismiss (Doc. No. 3) under Fed. R. Civ. P. 12(b)(6). In its complaint, Plaintiff Mecklenburg County brings claims of breach of contract, breach of the implied duty of good faith and fair dealing, fraud, negligent misrepresentation, and unfair and deceptive trade practices. For the reasons set forth below, this motion is **GRANTED** in part and **DENIED** in part.

I.  FACTUAL BACKGROUND

On October 1, 2002, Defendant Nortel Government Services ("Nortel") entered into a Master Agreement ("Agreement") with the North Carolina Administrative Office of the Courts ("AOC") and Plaintiff Mecklenburg County ("County") to provide both the County and AOC with an integrated criminal justice information system ("CJIS"). The purpose of the CJIS was to manage information in the County criminal justice system from initial arrest by law enforcement

1

to final disposition in the County Court system. The Agreement was divided into two parts - a County law enforcement software program and a County Courts software program. Under this Agreement, Nortel agreed to design, customize, implement, and deliver an integrated CJIS to the County by June 18, 2004 and to the Courts by July 12, 2005, in exchange for payments by the County and AOC totaling $17,388,202 over the life of the project. The County portion of the project entailed the final design, delivery, and implementation of customized software expected to interface and manage the County law enforcement system. The AOC portion of the project, which the AOC envisioned expanding to all Counties in the State, entailed the design and delivery of similar software to interface and manage County judicial system information.

Two years into the project, in the spring of 2004, the AOC withdrew from the project claiming lack of progress by Nortel. The County decided to stay in the contract and executed an addendum to the contract, which reflected the withdrawal of AOC and corresponding judiciary portion of the software and further reflected a new deadline and purchase price of $9,771,422. In consideration for this new Addendum, the County immediately paid Nortel $2,587,364.46. The addendum provided for delivery of the law enforcement CJIS to the County by July 13, 2004.

The Agreement, as modified by the addendum, provided for 1) the delivery of software to the County, 2) the inspection of the software for functional defects by the County, and lastly 3) a thorough test of the software during "System Acceptance Testing" ("SAT"). SAT was a contemplated two month process that would restart upon discovery of material failures or, alternatively, successfully terminate and deem the software accepted by the County.

The County contends Nortel made negligent and fraudulent misrepresentations, regarding the status and projected delivery date of the software, and that these representations

induced the County to continue the contract by signing the addendum. The County alleges that Nortel's first delivery of the software on July 26, 2004 revealed numerous functional defects in the software. Due to these alleged functional defects, SAT could not begin and was repeatedly delayed five more times over the next year. In a September 28, 2005 letter, the County communicated its intent to terminate the Agreement and give Nortel one last month to successfully deliver (or cure) the software. Nortel delivered the software on the last day of the period, November 7, 2005, but the County alleges "significant defects" existed in this last delivery of software.

The County terminated the Agreement and now brings suit seeking recovery of compensatory damages including the contract price of $9,771,422 with interest; staff, software, and hardware testing costs; consultant costs; punitive damages in tort; and statutory trebling of damages under the North Carolina Unfair Trade Practices Act.

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss for failure to state a claim upon which relief may be granted should be allowed if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (May 21, 2007). The allegations in plaintiff's complaint are presumed true at this stage and all reasonable factual inferences must be construed in plaintiff's favor. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.,* 52 F.3d 373, 375 (D.C.Cir.1995). However, "the court need not accept inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept

legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl.,* 127 S.Ct. at 1965.

B.  **Mecklenburg County's Contract Claims**

The County adequately alleges claims for both breach of contract and breach of the implied duty of good faith and fair dealing.  To establish a claim for breach of contract under North Carolina law, a plaintiff must show "(1) the existence of a valid contract and (2) breach of the terms of [the] contract." *Phelps-Dickerson Builders, L.L.C. v. American Partners,* 172 N.C. App. 427, 436, 617 S.E.2d 664, 670 (2005) *(quoting Poor v. Hill,* 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)*.* "It is well established that there is implied in every contract an obligation of good faith and fair dealing by each party in the performance of the agreement." *Dull v. Mutual of Omaha Ins. Co.,* 85 N.C.App. 310, 318 (1987) *(*citations omitted).

1.  **Existence of a Valid Contract**

The County meets its burden to allege a breach of contract on the part of Nortel.  The County's initial request for project proposal, the initial Master Agreement, and the Master Agreement as modified by the addendum all support the existence of a valid contract.  Both Master Agreements were signed by the parties and adequate consideration was included.

2.  **Breach of the Terms of the Contract**

The County also alleges a plausible breach of contract. Section 6 of the Agreement states that "[t]ime is of the essence in having the Company [Defendant Nortel] perform all services and deliver all products within the time frames provided by this agreement and the project plan, including all completion dates." This section further states that "[e]xcept as specifically stated in this Agreement, there shall be no extensions of the Completion Dates." *Id.* The County alleges that Defendant agreed to and later failed to meet completion dates for deliverance of a functionally complete software system, ready for SAT, on July 13, August 9 and November 1 of 2004. The County further alleges that Defendant failed to deliver a functionally complete system again in either March of 2005 or November 8, 2005. These combined allegations support the plausibility of a breach of contract, but this Court will also examine each potential breach alleged by the County individually.

      i.      *Mecklenburg County's Alleged Breach Precluding Recovery*

Nortel argues that the County's contract claims should be dismissed due to the County's own breach of section 5.2 of the Agreement titled "ACCEPTANCE." Nortel argues that because the County never began the SAT process, the County was precluded from terminating the agreement under section 5.2, which requires that 1) Nortel install the software component, 2) Nortel notify the County the software is functionally ready to begin SAT, 3) the County notify Nortel of any functional failures or alternatively, inform Nortel that SAT may begin, and 4) Nortel have ten days to correct functional failures identified by the County.

Section 5.2e(ii) of the Agreement, titled "Limits on the Acceptance Testing Process, Material Failures," specifically governs termination of the agreement for material failures once

5

SAT begins. This section states that "it is difficult to determine objectively the number of times that the acceptance test period for a Material Failure should be allowed to restart" and that the "acceptance test process shall continue . . . provided however, that in no event shall the acceptance test process continue" and goes on to define criteria for making the determination as to whether SAT should continue.

Nortel's argument that the County was precluded from terminating the agreement until SAT began does not take into account the specific facts constituting breach alleged by the Complaint. The County does not contend that SAT began and that material failures were discovered by means of the SAT process; had this been pled the County would in fact be governed by the SAT termination procedures of section 5.2(e)(ii). The County, instead, alleges that Nortel initially failed to deliver a functionally complete system, ready for acceptance testing, and that SAT could not begin due to Nortel's failure to timely deliver a functionally complete system. Although Nortel correctly points out that section 5.2(e)(ii) limits the County's ability to terminate once SAT begins, the contract's plain, repetitive use of "continue" and "restart" language indicates that this section only governs the termination process upon commencement of SAT. The County's termination prior to SAT, in response to Nortel's alleged failure to deliver a functionally complete system ready for SAT, does not preclude the County's breach of contract claim at this stage of the pleadings.

    ii.  *Mecklenburg County's Satisfaction of Notice and Cure Requirements*

Nortel argues that the County's contract claims should be dismissed because the County failed to give Nortel notice of defects and an opportunity to cure, as required by the Agreement, and therefore breached its own antecedent obligations. Pursuant to section 5.2 of the Agreement, which governs the overall acceptance testing process, the County was required to notify Nortel of functional failures and allow Nortel ten days to take corrective action. Prior to terminating the overall contract, the County was further required by section 13.3(c) of the Agreement to notify Nortel of its intent to terminate the agreement, to follow specific written procedural notices including a written reference to section 13.3, and to grant Nortel thirty-days to cure alleged failures.

Here, the County alleges satisfaction of section 5.2 of the Agreement in the complaint's first allegation of breach, on August 2, 2004, that "[d]efendant acknowledged that the software was not ready for SAT" and that "[d]efendant then unilaterally postponed SAT for three weeks . . . ." The County further alleges that notice and cure requirements of section 13 were satisfied by the County's September 28, 2005 letter to Nortel. The County alleges Nortel was given notice of functional defects in the software which Nortel allegedly failed to cure within the requisite cure period. The County has likewise adequately plead satisfaction of antecedent notice and cure requirements.

      iii.   *Conclusion*

This Court is unable to determine at this stage of the pleadings that the County, as a matter of law, breached the agreement thereby vitiating its claims. The complaint alleges facts that raise the County's right to relief above a merely speculative level, including 1) Nortel's

receipt of notice of failures under section 5.2, 2) Nortel's failure to cure functional defects within ten days, 3) the County's adherence to notice and cure requirements of section 13 prior to overall termination, and lastly, 4) specific contractual clauses that deem the failure to deliver a functionally complete system a material breach of the contract.

### C. Plaintiff's Claims of Unfair and Deceptive Trade Practices, Fraud, and Negligent Misrepresentation

This Court will now address the County's remaining non-contractual claims of fraud, unfair and deceptive trade practices, and negligent misrepresentation. These claims are fatally deficient because the complaint fails to sufficiently allege identifiable and distinct facts, arising outside of the primary breach of contract, to overcome the North Carolina economic loss doctrine.

The economic loss doctrine was first explained by the North Carolina Supreme Court in *North Carolina Ports Authority v. Lloyd A. Fry Roofing, Co.,* 294 N.C. 73, 81 (1978) *(rev'd* on other grounds), where the Supreme Court outlined the general rule that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." The Fourth Circuit further clarified North Carolina's application of the rule and carefully explained the underlying purpose of the doctrine in *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir. 1998). The Fourth Circuit explained that, in *Broussard*, the dispute centered around the interpretation and performance of a thirty-five page contract and that "[t]he crux of this matter is and always has been a contract dispute." *Id.* at 346. The Court reasoned that parties contract to control and minimize their future risks and that importing tort law principles of

punishment "undermines their ability to do so." *Id.* The plaintiff's claims for negligence in *Broussard* arose out of performance of the contract, "not out of the type of distinct circumstances necessary to allege an independent tort." *Id.* at 347.

Here, similar to *Broussard*, the County fails to allege distinct and identifiable facts outside of contract performance. The County alleges facts based on Nortel's performance of the contract and this case is at heart a contractual dispute. At first blush, the County makes a compelling argument that Nortel tortuously made representations to the County which induced the County to continue the contract, make payments, and sign the addendum. This argument is flawed, however, because at the heart of the County's allegation is the performance of the contract; the "delivery, completion of acceptance testing, implementation and/or go-live dates" for a functionally complete CJIS, ready for SAT, are the substance of Nortel's alleged misrepresentations. These statements by Nortel, addressing the level of preparation and functional readiness of the CJIS, directly relate to Nortel's performance of the contract.

Although the County argues Nortel was negligent and fraudulent in its statements regarding this performance, this position does not change the fact that these statements were directly related to Nortel's performance of essential portions of the contract. Such negligent or intentional actions, relating to contract performance, do not transform contract claims into independent torts or trade practice claims; the negligent or intentional nature of the actions is irrelevant. *E.g.*, *Broussard* at 347( citing to *Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53 (1992) (holding that a mere breach of contract, even if intentional, does not give rise to independent non-contractual claims).

9

The County fails to allege distinct, carefully circumscribed facts that could overcome the underlying policy of the economic loss doctrine, which supports dismissal. These sophisticated, commercial parties drafted a complex contract to govern nearly every aspect of the their relationship, analogous to *Broussard*, even including a termination provision contemplating oral or written misrepresentations by Nortel and a damages provision allowing for pursuit of specific performance by the County. The introduction of punitive damages into this contract centered litigation would only undermine the ability of parties to minimize future risk. Allowing the County to recover a purely economic loss in tort would eviscerate the North Carolina distinction between contract and tort law. The County's claims of fraud, unfair and deceptive trade practices, and negligent misrepresentation are therefore dismissed.

For these reasons, it is **ORDERED** that Defendant Nortel Government Services' Motion to Dismiss is **GRANTED** as to counts III, IV, and V and **DENIED** as to Counts I and II.

Signed: April 1, 2008

Graham C. Mullen
United States District Judge